**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ALICE SISSON, | ) | CASE NO. 5:15-CV-552 |
| | ) | |
| Plaintiff, | ) | JUDGE NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Alice Sisson ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

her application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a).  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends

that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

On November 10, 2004, Plaintiff filed her application for SSI, alleging a disability

onset date of November 16, 2003.  (Transcript ("Tr.") 70-71, 316.)  The application was

denied initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (Tr. 56-58, 60-63.)  On September 5, 2007, an ALJ

(Mark Carissimi) held Plaintiff's hearing.  (Tr. 540-563.)  Plaintiff participated in the

hearing, was represented by counsel, and testified.  (*Id.*)  A medical expert ("ME") and a

vocational expert ("VE") also participated and testified.  (*Id.*)  On October 26, 2007, the ALJ found Plaintiff not disabled.  (Tr. 316-323.)  On March 11, 2010, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings.[1] (Tr. 327-39.)

On October 25, 2010, a different ALJ (Peter Beekman) held a second hearing. (Tr.  564-581.)  Again, Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  There was no ME at this hearing.  (*Id.*)  A VE appeared, but did not testify.  (*Id.*)  On January 27, 2012, the ALJ found Plaintiff not disabled, after sending interrogatories to a vocational consultant post-hearing.  (Tr. 430-441.)  On February 21, 2013, the Appeals Council once again vacated the ALJ decision and remanded for further proceedings.[2]  (Tr. 443-445.)

On September 4, 2013, a third ALJ (Paula Goodrich) held a hearing.  (Tr. 582-620.)  Plaintiff participated in the hearing, was represented by counsel, and testified. (*Id.*)  There was no ME at this hearing, but a VE did appear and testify.  (*Id.*)  On November 7, 2013, the ALJ found Plaintiff not disabled.  (Tr. 17-28.)  On January 14, 2015, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 9-11.)

---

[1] The Appeals Council vacated and remanded because the hearing decision (1) did not contain an adequate evaluation of the opinion of consultative examiner Frederick Leidal, Psy.D; and, (2) failed to contain rationale for the "B" and "C" criteria using the special technique described in 20 C.F.R. 416.920a.  (Tr. 328.)

[2] The Appeals Council vacated and remanded the second ALJ decision because (1) "the procedures for proffering post-hearing vocational expert evidence were not completed in accordance with HALLEX 1-2-5-58;" and, (2) the administrative record was incomplete because the VE responses to interrogatories were not entered into the record as an exhibit.  (Tr. 444.)

On March 20, 2015, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11, 14, 15.)

Plaintiff asserts the following assignments of error: (1) the ALJ denied Plaintiff a fair process by failing to follow the Appeals Council's Order on remand; (2) the ALJ erred by assigning a "one-size-fits-all" residual functional capacity ("RFC") regarding Plaintiff's impairments over a nine year evaluation period; (3) the ALJ improperly evaluated Plaintiff's credibility; and, (4) the ALJ improperly analyzed the opinions of examining psychologist Frederick Leidal, Psy.D., and medical expert Gottfried Spring, M.D.  (Doc. No. 11.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in February 1963 and was 50 years old on the date of the decision.[3]  (Tr. 27.)  She had at least a 9th grade education and was able to communicate in English.  (Tr. 27, 556-557.)  She had past relevant work as a retail sales clerk.  *(* Tr. 27.)

### B.    Medical Evidence

#### 1.    Medical Reports

_____

[3] In the decision, the ALJ found Plaintiff was a younger individual, age 41, on the date the application was filed, but did not acknowledge that Plaintiff changed age categories and was considered a person closely approaching advanced age before the disability determination was rendered.  (Tr. 27.) When applying the age categories, "the claimant's age as of the time of the decision governs." *Varley v. Sec. of Health & Human Servs., 820 F.2d 777, 780 (6th Cir. 1987).* Here, Plaintiff does not raise any assignment of error based on her change in age categories.

3

### a. Mental Impairments

In February 2004, Plaintiff underwent a psychiatric evaluation with Scott Schmitt, M.D. (Tr. 212-214.) She reported problems with depression since her teenage years, including periods of depression lasting weeks at a time with crying spells, irritability, and anxiety. (Tr. 212.) During these periods, she reported difficulty with her thinking, concentration, and memory. (*Id.*) Dr. Schmitt observed slight psychomotor retardation and a restricted but pleasant affect. (Tr. 213.) He also found Plaintiff's answers to be direct without circumstantiality, tangentiality, or loosening of association. (*Id.*)

Dr. Schmitt diagnosed major depressive disorder, recurrent, moderate; and, alcohol, cannabis, and cocaine dependence, in sustained full remission. (Tr. 213-214.) He assessed a Global Assessment of Functioning ("GAF") of 48, indicating serious symptoms.[4] (Tr. 214.) Dr. Schmitt prescribed medication. (*Id.*)

In March 2004, at the request of the Ohio Bureau of Vocational Rehabilitation ("Ohio BVR"), Plaintiff underwent a neuropsychological examination with Frederick Leidal, Psy.D. (Tr. 233-247.) Dr. Leidal noted Plaintiff's psychiatric history was remarkable for "longstanding problems with depression." (Tr. 234.) Plaintiff reported the use of psychotropic medications, including Remeron, "which she said was fairly effective at helping her sleep, although [she] said that she has since run out" of medication. (Tr. 235.) Dr. Leidal found Plaintiff was able to attend to questions and

---

[4]The GAF scale incorporates an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health illness devised by the American Psychiatric Association. A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.

4

was not markedly distracted or impaired.  (Tr. 236.)  Her "ability to understand and

comprehend simple language, in the form of simple verbal directions during the exam,

appeared good, and ability to understand more complex directions and language was

fair to below average." (*Id.*)  Dr. Leidal also noted below average memory; below

average to poor judgment; and below average impulse control.  (*Id.*)

Dr. Leidal conducted a number of neuropsychological tests during the

examination, including the Wechsler Adult Intelligence Scale- Third Edition ("WAIS-III").

(Tr. 239.)  Plaintiff achieved a full scale IQ of 76; verbal IQ of 71; and performance IQ of

85.  (*Id.*)  Dr. Leidal estimated her intelligence to be in the borderline range of

intellectual functioning.  (Tr. 236, 244-245.)

Plaintiff described her mood as "mean, irritable, and depressed;" however, Dr.

Leidal noted that her affect during examination was "typically very normal, not flat or

blunted, and appeared incongruent with her stated mood."  (Tr. 236.)  He later indicated

that Plaintiff's personality profile suggested "exaggerat[ion of] psychological and/or

physical symptoms" and "magnification of problems for attention or a need to be seen

as impaired for secondary gain."  (Tr. 242.)

Dr. Leidal assessed dysthymic disorder, post-traumatic stress disorder,

personality disorder, and borderline intellectual functioning.  (Tr. 244.)  He indicated

Plaintiff appeared to function poorly for most social and interpersonal situations and

personality test results suggested psychopathology that would affect her daily living.

(Tr. 245.)  He concluded Plaintiff "is probably not emotionally stable enough . . . to

consider employment" and "would be well advised to seek further stabilization before

she considers seeking either further training or job placement."  (Tr. 246.)  He assessed

a GAF of 50, representing serious symptoms.  (Tr. 244.)

Plaintiff presented to primary care physician Lawrence Bouchard, M.D., in April 2004 with complaints of exacerbated depression and fatigue. (Tr. 146.)  Dr. Bouchard concluded that "nerve pills are not indicated" and recommended Plaintiff seek employment.  (*Id.*)  He referred her to mental health treatment for a possible retrial of antidepressants.   (*Id.*)

In June 2004, at the request of the Ohio BVR, Jill Lowery, LPCC, completed a Mental Assessment of Plaintiff's ability to do work-related activities.  (Tr. 263-264.)  Ms. Lowery assessed Plaintiff had a "fair"[5] ability to interact with supervisors; deal with work stresses; understand, remember, and carry out complex job instructions and tasks; maintain attention and concentration; and relate predictably to social situations. (*Id.*) She found Plaintiff had a "good"[6] ability to follow work rules; relate to coworkers; deal with the public; use work judgment; function independently; understand, remember, and carry out detailed but not complex job instructions and tasks; maintain personal appearance; behave in an emotionally stable manner; demonstrate reliability; and persist in work activity.  (*Id.*)  Finally, she assessed "unlimited/very good" ability to understand, remember, and carry out simple job instructions and tasks.  (*Id.*)

Ms. Lowery indicated diagnoses of major depressive disorder, recurrent, moderate; post-traumatic stress disorder; personality disorder; and alcohol/cannabis

---

[5] The form defined the term "fair" as "ability to function in this area is seriously limited but not precluded."  (Tr. 263.)

[6] The form defines the term "good" as "ability to function in this area is limited but satisfactory."   (Tr. 263.)

dependence in sustained full remission.  (Tr. 264.)  She assessed a GAF of 55, indicating moderate symptoms. [7]  (*Id.*)  Lastly, Ms. Lowery opined that Plaintiff appeared to be "maintaining emotional stability and an ability to deal with the stresses associated with returning to work and/or participating in vocational rehabilitation."  (*Id.*)

Plaintiff presented to psychiatrist Myung Kwak, M.D., in October 2004.  (Tr. 211.)  She reported decreased irritability and improved sleeping.  (*Id.*)  Dr. Kwak found mild to moderate depression and continued her medication.  (*Id.*)  In a letter dated December 2004, Dr. Kwak stated Plaintiff had missed her November 2004 psychiatric session and discontinued individual therapy.  (Tr. 209.)

The medical record indicates Plaintiff returned to Dr. Kwak on seven occasions in 2005.   (Tr. 266, 278-283.)  During this time period, Plaintiff reported a number of personal stressors, including the anniversary of her father's death.  (*Id.*)  Dr. Kwak nonetheless assessed mild to moderate depression; mild to moderate anger; and mild to moderate anxiety.  (*Id.*)  He continued Plaintiff on Mirtazapine and Quetiapine, increasing the dosage on occasion.  (*Id.*)

Plaintiff presented to Dr. Kwak in February, April and June 2006.  (Tr. 275-277.)  At each visit, Dr. Kwak assessed mild to moderate depression and mild anxiety.  (*Id.*)  He continued her medications.  (*Id.*)  In September 2006, Plaintiff presented to Judith Corcelli, APRN, BC., a certified nurse specialist with Dr. Kwak's practice.  (Tr. 294.)  Plaintiff reported poor sleep, irritability, and crying spells.  (*Id.*)  Ms. Corcelli assessed organized and logical thought process, relevant thought content, dysphoric mood,

---

[7] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

appropriate affect, cooperative and appropriate behavior, and adequate insight and judgment.  (*Id.*)  Ms. Corcelli recorded similar findings in November 2006.  (Tr. 290-291.)

Plaintiff presented to Ms. Corcelli in January, March, June, and August 2007.  (Tr 288, 305-312.)  Plaintiff complained of continued life stressors, including the death of a friend and the diagnoses of her mother and brother with cancer.  (*Id.*)  Treatment notes indicate Plaintiff's symptoms waxed and waned during this time period.  In January, Plaintiff reported improved sleep and less irritability.  (Tr. 288.)  In March, she indicated daily crying spells and increased irritability.  (Tr. 311-312.)  In June, Plaintiff reported auditory hallucinations, which she described as "vague talking noises occasionally that sound like it is coming from the basement."  (Tr. 308.)  Throughout 2007, Ms. Corcelli consistently assessed organized and logical thought process, relevant thought content, dysphoric mood, blunted or reactive affect, cooperative and appropriate behavior, and adequate insight and judgment.  (Tr. 288, 305-312.)

Plaintiff returned for treatment in January, March, May, July, August, October, and December 2008.  (Tr. 397-416.)  Plaintiff continued to face numerous stressful personal issues, including the death of her mother, brother, and uncle.  (*Id.*)  She reported running out of her medication and having suicidal thoughts in January, but denied a current intent.  (Tr. 414-416.)  By March, Plaintiff rated her depression a 10 on a scale of 10 and was tearful during the appointment.  (Tr. 409-413.)  In July, Plaintiff was slightly improved, rating both her depression and anxiety an 8 on a scale of 10.  (Tr. 404.)  Ms. Corcelli consistently observed dysphoria and either blunted or reactive affect during this time period, although she also noted organized and logical thought

8

process, relevant thought content, cooperative and appropriate behavior, and adequate insight and judgment.  (Tr. 397-416.)  Plaintiff continued her medication regimen of Seroquel, Remeron, Wellbutrin.  (*Id*.)  She began taking Zoloft in December 2008.[8]  (Tr. 397.)

Plaintiff presented to Ms. Corcelli in February, April, June, September and November 2009.  (Tr. 381-396.)  For most of 2009, Plaintiff reported improved sleep, increased energy, and a stable mood.  In January, Plaintiff indicated Zoloft appeared to be helping. (Tr 394-396.)  In April, Plaintiff was sleeping "pretty well," had reduced her Zoloft to every other day, and was only mildly dysphoric.  (Tr. 391-393.)  In June and September, Plaintiff reported feeling better with increased energy and stable mood.  (Tr. 385-390.)  Ms. Corcelli noted euthymic mood and reactive affect, and discontinued Remeron.  (*Id*.)  However, in November, Plaintiff reported difficulty sleeping and crying spells in response to the anniversary of her mother's death.  (Tr. 381-384.)  Ms. Corcelli noted a dysphoric mood and labile/teary affect.  (*Id*.)  She prescribed Ambien on a temporary basis.[9]  (*Id*.)

---

[8] Plaintiff also presented to Dr. Bouchard on several occasions in 2008 for treatment of a variety of issues, including depression.  (Tr. 358-363.)  In January 2008, Dr. Bouchard noted a depressed affect, which he described as Plaintiff's "baseline in my experience."  (Tr. 362.)  In April, Dr. Bouchard noted increased depression and stress, as well as poor sleep, as a result of the death of Plaintiff's brother.  (Tr. 360.)  In June, Dr. Bouchard noted continued "stress issues."  (Tr. 358.)

[9] Plaintiff also presented to Dr. Bouchard during 2009.  (Tr. 342-350.)  In March 2009, Dr. Bouchard described Plaintiff's depression as being under fair control.  (Tr. 350.)  In April, he noted that Plaintiff continued to be depressed.  (Tr. 348.)  In October, Dr. Bouchard remarked that Plaintiff's depression was partially controlled.  (Tr. 342.)

Plaintiff presented to Ms. Corcelli regularly in 2010, seeing her on eight occasions.  (Tr. 372-380, 417-426, 518-522.)  In January, Plaintiff reported her medication was working well, but was "very discouraged over the prospect she will lose her [medical] benefits."  (Tr. 378-380.)  The following month, Plaintiff was "doing alright" but indicated she would be losing her prescription coverage the end of the month.  (Tr. 375-377.)  By June, Plaintiff had lost her health coverage and had not taken her medication for ten days at the time of her appointment.  (Tr. 423-426.)  She reported increased stress and irritability.  (*Id.*)  In August, Plaintiff indicated she was stable on her medication.  (Tr. 420.)  However, she reported auditory hallucinations throughout the fall of 2010.  (Tr. 420-422, 417-418, 520-522.)  Ms. Corcelli adjusted Plaintiff's medications.  (*Id.*)  In December 2010, Plaintiff denied auditory hallucinations and reported feeling "fairly well" with the exception of impaired sleep.  (Tr. 518-519.)

Throughout 2010, Ms. Corcelli assessed organized and logical thought process, relevant thought content, cooperative and appropriate behavior, and adequate insight and judgment.  (Tr. 372-380, 417-426, 518-522.)  She generally assessed mild dysphoria and reactive affect during the first half of 2010, and euthymic mood and "affective blunting" in the latter half of the year.  (*Id.*)

Plaintiff returned to Ms. Corcelli on several occasions in 2011.  (Tr. 496-516.)  She was generally stable during this time period, often reporting her medications "worked well" and she was "doing alright."  (Tr. 513-514, 506-509, 503-505.)  A psychiatric/pharmacological management plan signed by Ms. Corcelli on June 30, 2011 and psychiatrist A. Montinola, M.D., indicates Plaintiff was assessed a GAF of 65, representing mild symptoms.  (Tr. 495.)  This same form indicated Plaintiff's GAF for the

10

current year was 65.  (*Id.*)  In September 2011, however, Plaintiff ran out of her medication and felt shaky, nauseated, and stressed.  (Tr. 499-501.)  She reported fleeting suicidal ideation.  (*Id.*)  In December, Plaintiff reported struggling with her many recent personal losses, but otherwise felt stable.  (Tr. 496-498.)

Plaintiff presented to Ms. Corcelli in March, June, September and November 2012, and in February and May of 2013.  (Tr. 530-538.)  Throughout most of 2012, Plaintiff continued to report "doing alright" with a stable mood.  (Tr. 534-538.)  In November 2012, however, Plaintiff reported increased depression, which she rated a 10 on a scale of 10.  (Tr. 533.)  In February 2013, Plaintiff complained of headaches, impaired sleep, and difficulties with attention, concentration, and memory.  (Tr. 532.)  Ms. Corcelli assessed a constricted/blunted affect, and depressed mood.  (*Id.*)  In May 2013, Plaintiff reported her medication was "working well" and stated she felt "pretty stable when she has medication."  (Tr. 530-531.)  Ms. Corcelli continued to prescribe Zoloft, Wellbutrin, and Seroquel.  (*Id.*)

### b.  Relevant Physical Impairments[10]

The earliest mention in the record of Plaintiff's migraine headaches is a treatment note dated September 2003.[11]  (Tr. 195.)  At that time, Plaintiff complained of ongoing headaches accompanied by nausea and vomiting.  (*Id.*)  In November 2003, Plaintiff reported continued daily headaches.  (Tr. 193.)  The following month, Plaintiff reported

---

[10] As the only physical impairment discussed in Plaintiff's brief is her migraine headaches, the Court will confine its discussion of the physical medical evidence to that impairment.

[11] The physician's signature is illegible. (Tr. 195.)

taking Axert for four weeks with no relief, and rated her headache pain a 9 on a scale of 10.  (Tr. 191)

In April 2004, Plaintiff reported daily headaches every morning with nausea, blurred vision, and "black spots."  (Tr. 189.)  She had tried a number of different medications, including Botox injections, with no relief.  (*Id*.)  Plaintiff was diagnosed with intractable headache and chronic daily headaches.  (*Id*.)  In June 2004, Plaintiff reported chronic daily headaches for a year.  (Tr. 187.)  The physician (whose name does not appear on the treatment note) ordered an MRI and referred Plaintiff to a headache specialist.  (*Id*.)  Plaintiff underwent an MRI of the brain in July 2004, which was negative.  (Tr. 150.)

In June 2004, at the request of the Ohio BVR, Plaintiff underwent a physical functional capacity evaluation with occupational therapist Patricia Schroeder, OTR/L.  (Tr. 248-262.)  Ms. Schroeder concluded Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently; stand for eight hours, walk for four to five hours and sit for eight hours in an eight hour workday; frequently climb, balance, stoop, crouch, and kneel; occasionally crawl; frequently reach; and constantly handle, finger, and feel.  (Tr. 248-249, 251.)  However, Ms. Schroeder invalidated the evaluation results because she found they represented "a manipulated effort" by Plaintiff.  (Tr. 251.)

Plaintiff presented to Dr. Bouchard for follow up regarding her migraines in August 2004.  (Tr. 144.)  Dr. Bouchard noted she was presently taking Neurontin, Topamax, and Remeron.  (*Id*.)  Aside from a bilateral equally weak grip, Plaintiff's neurological exam was within normal limits.  (*Id*.)

Plaintiff presented for treatment in April 2005, complaining of a headache lasting

12

for five days.  (Tr. 271.)  She rated the pain a 9 on a scale of 10, and reported blurred

vision, nausea, and "difficulty with words during headaches."  (*Id.*)  In May 2005, Plaintiff

reported Imitrex was "working well" to control her headaches.  (Tr. 270.)  In September

2005, Plaintiff presented to Dr. Bouchard for follow up treatment regarding her

fibromyalgia, headaches, and depression.  (Tr. 269.)  Dr. Bouchard noted Plaintiff's

headaches were controlled well with Imitrex, if caught early.  (*Id.*)

In April 2009, Plaintiff reported to Dr. Bouchard that she used Imitrex only

occasionally.  (Tr. 348.)

In February 2013, Plaintiff complained she recently had problems with

headaches, but attributed them to a reduction in her caffeine intake.[12]  (Tr. 532.)

## 2.    Agency Reports

In February 2005, psychologist Patricia Semmelman, Ph.D., reviewed the record

and assessed Plaintiff's mental limitations.  (Tr. 215-231.)  Dr. Semmelman opined that

Plaintiff could understand, remember, and carry out simple and detailed instructions;

maintain attention and concentration for extended periods; make simple work-related

decisions; perform activities within a schedule, maintain regular attendance and be

punctual within a customary tolerance; and work in coordination with others without

being distracted.  (Tr. 229.)  She was not significantly limited in her ability to interact

appropriately with the general public; ask simple questions or request assistance;

accept instructions and respond appropriately to criticism from supervisors; get along

with coworkers or peers without distracting them or exhibiting behavioral extremes; and

---

[12] The parties do not direct this Court's attention to any other evidence in the
record regarding Plaintiff's migraines.

maintain socially appropriately behavior and adhere to basic standards of neatness and cleanliness.  (Tr. 230.)

Plaintiff was moderately limited, however, in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 230.)  She was also moderately limited in her ability to respond appropriately to changes in the work setting.  (*Id.*)

In the narrative section of her assessment, Dr. Semmelman stated Plaintiff's social skills were mildly to moderately impaired.  (Tr. 231.)  She opined that Plaintiff could "interact occasionally and superficially and receive instructions and ask questions appropriately in a work setting."  (*Id.*)  Plaintiff could also "cope with ordinary and routine changes in a work setting that is not fast paced or of high demand."  (*Id.*)

Psychologist Douglas Pawlarcyzyk, Ph.D., reviewed the record and assessed Plaintiff's mental limitations in June 2015.  (Tr.  215, 231.)  He affirmed Dr. Semmelman's opinion.  (*Id.*)

C.    **Hearing Testimony**

1.    **Plaintiff's Hearing Testimony**

Plaintiff testified at three hearings relating to her November 2004 SSI application. At the first hearing, conducted in September 2007, Plaintiff stated she had been in treatment for bipolar disorder since 2001.  (Tr. 546-547.)  Her symptoms included mood swings and crying spells.  (Tr. 547-548.)  Plaintiff was taking Seroquel, Wellbutrin, and Remeron.  (Tr. 547.)  She lived with her 20 year old son, who helped with the cleaning and grocery shopping.  (Tr. 555.)  Plaintiff did the cooking and the dishes.  (Tr. 549,

14

555.)

Plaintiff was in special education classes beginning in the seventh grade, and dropped out of high school after the ninth grade. (Tr. 556-557.) She was unable to concentrate long enough to watch a 30 minute television show, and could not read a newspaper article because of poor reading comprehension. (Tr. 549.) She had, however, volunteered part-time for a local television station and the zoo. (Tr. 552.)

On remand from the Appeals Council, a second hearing was conducted on October 25, 2010. (Tr. 564-581.) Plaintiff testified she had suffered from depression since childhood and that it had worsened in the last eight to nine years. (Tr. 571.) Her symptoms included irritability, meanness, tiredness, and mood swings. (*Id.*) Plaintiff was unable to work because she could not get up on time in the morning and could not stay awake during the day. (Tr. 570.) She took medication to help her sleep due to severe nightmares. (Tr. 571.) She experienced auditory hallucinations but thought it might be due to her medication. (Tr. 572-573.)

Plaintiff also suffered from migraines. (Tr. 574-575.) She had been prescribed medication for this condition, but could no longer afford it due to the loss of her medical insurance. (Tr. 575.) She experienced migraines once or twice per month, lasting for one to two days straight. (*Id.*) She no longer had as much help around the house, as her son no longer lived with her. (Tr. 578-579.) She did some limited cleaning. (Tr. 578.) She had difficulty following television programs or remembering what she had read. (Tr. 577.)

Plaintiff's third, and final, hearing was conducted in September 2013. (Tr. 582-620.) Plaintiff testified she was unable to work because she had trouble sleeping, woke

15

up with migraines, and did not want to get out of bed.  (Tr. 593-A.)  She had struggled

with depression all her life.  (Tr. 602-603.)  She attempted suicide twice in the past but

had not tried to harm herself since her last suicide attempt in 2001.  (Tr. 603.)  Plaintiff

had been taking Wellbutrin and Zoloft for her depression since 2009.  (Tr. 596-597.)  At

first, her medication was helpful in preventing crying spells.  (Tr. 598-599.)  The

medication became less effective over time, however, and she now had crying spells

once or twice/day lasting 15 to 20 minutes in duration.  (Tr.  600-601.)  She also

experienced mood swings and felt "mean and hateful."  (Tr. 600.)

Plaintiff continued to suffer from migraines.  (Tr. 594-595.)  She received

treatment and medication for this condition until 2009, when she lost her medical

insurance.  (*Id.*)  At the time of the hearing, she had migraines two to three times per

week lasting two hours in duration.  (*Id.*)  The pain was a 10 on a scale of 10, but she

did not go the emergency room because she lacked insurance.  (Tr. 595-596.)

On a typical day, Plaintiff was awake for four to five hours, did the dishes and

cooking, and tried to take a walk.  (Tr. 597-598.)  She went to the grocery store every

two weeks with a friend.   (Tr. 598.)  Starting six months ago, she stopped changing her

clothes and showering regularly.  (Tr. 601-602.)  She remained in her bed clothes four

to five days each week, and sometimes went for even longer without a shower.  (*Id.*)

She rarely went out of the house for social activities.  (Tr. 603, 610.)  She sometimes

read children's books or played video games to distract herself from crying.  (Tr. 606.)

### 2.     Medical Expert's Hearing Testimony

Medical expert Gottfried Spring, M.D., a board certified psychiatrist, testified at

Plaintiff's first hearing, in September 2007.  (Tr. 555-559.)  He stated Plaintiff had been

16

diagnosed with major depressive disorder and post-traumatic stress disorder.  (Tr. 556.)

Dr. Spring also testified that Plaintiff had a full scale IQ score of 71, which was indicative

of borderline intellectual functioning.  (Tr. 556, 558.)  When asked if he had an opinion

regarding the limitations Plaintiff's impairments would cause, Dr. Spring stated as

follows: "Well, the limitation would be to have a simple, low stress work with minimal

contact with co-workers, no quotas, no conflict resolution, where she pretty much could

pace herself."  (Tr. 559.)

### 3.    Vocational Expert's Hearing Testimony

Gene Burkhammer, a vocational expert ("VE") testified at Plaintiff's first hearing,

in September 2007.  (Tr. 559-562.)  The ALJ asked the VE to assume a hypothetical

individual of Plaintiff's age, education, and work experience.  (Tr. 561.)  The individual

would not have any exertional limitations, but would have the following non-exertional

limitations.  (*Id.*)  The individual was limited to simple, routine work.  (*Id.*)  She could not

perform high production quota work or piece work.  (*Id.*)  She could have superficial

interaction with coworkers and the public, but without negotiation or confrontation.  (*Id.*)

The VE testified the individual would be able to perform such jobs as laundry laborer,

housekeeping cleaner, and car wash attendant.  (Tr. 561-562.)  The ALJ then added a

limitation that the individual would be off task 20 percent of the time.  (Tr. 562.)  The VE

testified there would no work for an individual with this additional limitation.  (*Id.*)

There was no VE testimony at Plaintiff's second hearing.  Mr. Burkhammer did,

however, appear and testify at Plaintiff's third hearing, in September 2013.  (Tr. 612-

619.)  The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age,

education, and work experience.  (Tr. 614.)  The individual would not have any

17

exertional limitations, but would have the following non-exertional limitations.  (*Id.*)  The individual was limited to simple, routine, and repetitive tasks involving only simple, work-related decisions.  (*Id.*)  She could not perform in stressful situations defined as tasks which involve high production quotas or tasks that were production-rate pay (such as assembly line work) but could perform goal-oriented work such as office cleaning.  (*Id.*)  She was limited to an environment with little variation in duties; i.e., few, if any, work place changes with any changes easily explained.  (*Id.*)  She could have occasional and superficial interaction with the public and coworkers but could not perform work that involved persuading others, arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety or welfare of others.  (Tr. 614-615.)  The VE testified the individual would be able to perform jobs such as laundry laborer, order puller, and housekeeping cleaner.  (Tr. 615.)

The ALJ then asked a second hypothetical that was the same as the first, except that it limited the individual to the light exertional level.  (Tr. 616.)  The VE testified such an individual would be able to perform jobs such as housekeeping cleaner, mail clerk, and clerical assistant.  (*Id.*)  The ALJ then asked the VE regarding the effect of absences or leaving work early.  (*Id.*)  The VE testified there would be no work available for an individual who missed three or more days of work per month due to absences and/or leaving work early.  (Tr. 616-617.)  Finally, the ALJ asked the VE whether there would be jobs available for an individual who was off task during the work days.  (Tr. 617.)  The VE testified there would be no work available for an individual who was off task 15 percent or more on an ongoing basis.  (*Id.*)

### III.    STANDARD FOR DISABILITY

18

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past

19

relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since November 10, 2004.

2.    The claimant has the following severe impairments: major depressive disorder, recurrent, moderate; major depressive disorder, recurrent with psychotic features; posttraumatic stress disorder, personality disorder, mood disorder and dysthymic disorder with childhood onset.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple, routine and repetitive tasks involving only simple, work-related decisions; she is not able to perform in stressful situations defined as tasks that involve high production quotas or tasks at production rate pace (e.g., assembly line work) but can perform goal oriented work (e.g., office cleaner) in an environment where there is little variation in duties expected with few, if any, work place changes and any changes are easily explained; she can have occasional and superficial interaction with the public or coworkers, which does not involve persuading, arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety or welfare of others.

5.    The claimant is unable to perform any past relevant work.

6.    The claimant was born on February 6, 1963, and was 41 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.    The claimant has a limited education and is able to communicate in English.

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, since November 10, 2004, the date the application was filed.

(Tr. 17-28.)

## V.  LAW & ANALYSIS

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.      Plaintiff's Assignments of Error**

**1.  The ALJ's Alleged Failure to Follow the Appeals Council Order of Remand**

Plaintiff argues the ALJ committed procedural error and denied her a fair process by failing to follow the Appeals Council's Order of remand.  In February 2013, the Appeals Council vacated the second ALJ decision and ordered as follows:

> Upon remand, the Administrative Law Judge will:
>
> •        Obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14).  The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).
>
> * * *
>
> In compliance with the above, the Administrative Law Judge will offer the claimant an opportunity for a hearing, address the evidence which was submitted with the request for review, take any further action needed to complete the administrative record and issue a new

decision.

(Tr. 444-445.)

Plaintiff maintains that, consistent with the testimony of medical expert Dr. Spring, the second ALJ's RFC limited Plaintiff to work that involved no production quotas or piece rate work.  Plaintiff asserts the third ALJ exceeded the scope of the Appeals Council's Order of remand by formulating a new RFC that does not contain a similar limitation.[13]  Although not entirely clear, Plaintiff appears to argue she was denied "fair process" because, if the third ALJ improperly exceeded the scope of the remand order and the second ALJ's more restrictive RFC remains in place, "then there is no vocational expert testimony identifying jobs in the national economy that Plaintiff could perform."  (Doc. No. 11 at 8.)

20 C.F.R. § 416.1477(b) provides that an ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order."  Federal courts are not in

---

[13]  Plaintiff does not argue that the second ALJ's RFC determination was binding on the third ALJ pursuant to _Dennard v. Sec'y of Health & Human Servs._, 907 F.2d 598 (6th Cir. 1990) and _Drummond v. Comm'r of Soc. Sec._, 126 F.3d 837 (6th Cir. 1997).  Any such argument would be without merit as the only final decision in this matter is the third ALJ's November 7, 2013 decision.  _See e.g., Wireman v. Comm'r of Soc. Sec._, 60 Fed. App'x 570, 571 (6th Cir. 2003) ("The only final decision in this case is the March 15, 2000, hearing decision which is now before this court.  All other decisions relevant to Wireman's social security disability insurance benefits never became final as they were vacated pursuant to remands for further proceedings.  Therefore, Wireman's contention that the ALJ was bound by the findings of ALJ Cogan is meritless."); _Davis v. Callahan_, 145 F.3d 1330 (6th Cir. 1998) ("Under _Dennard_, collateral estoppel applies to a prior final decision.  In this case, the Appeals Council vacated the 1992 decision.  Therefore, the 1992 decision was not a final decision and _Dennard_ is not applicable.").

agreement regarding "whether an ALJ's failure to follow Appeals Council directives in a remand order may serve as independent grounds for reversal absent other error." *Godbey v. Colvin*, 2014 WL 4437647, at *5 (W.D. Ky. Sept. 9, 2014) (citing *Schults v. Colvin*, 1 F.Supp.3d 712, 716 (E.D. Ky. 2014)).  "Differing opinions exist not only between circuits, but also among courts within the Sixth Circuit, which has not considered this particular issue."  *Schults*, 1 F.Supp.3d at 716 (citing *Brown v. Comm'r of Soc. Sec.*, 2009 WL 465708 (W.D. Mich. Feb.24, 2009); *Salvati v. Astrue*, 2010 WL 546490 (E.D. Tenn. Feb.10, 2010)).  Some courts consider an ALJ's failure to comply with directives of the Appeals Council to be a procedural error rising to the level of a denial of fair process.  *See e.g., Godbey*, 2014 WL 4437647 at *6–7; *Salvati*, 2010 WL 546490 at *4–8.*  Others (including at least one decision from this District) assume, without deciding, that such an error may serve as an independent ground for reversal. *See e.g., Keating v. Comm'r of Soc. Sec.*, 2014 WL 1238611, at *15 (N.D. Ohio Mar. 25, 2014) (McHargh, M.J.); *Kearney v. Colvin*, 14 F.Supp.3d 943, 950 (S.D. Ohio 2014); *Shults*, 1 F.Supp.3d at 716.

"The overwhelming majority of courts in this circuit, however, have determined that federal courts lack jurisdiction to consider whether an administrative law judge complied with the Appeals Council's instructions on remand."  *Shope v. Comm'r of Soc. Sec.*, 2015 WL 3823165 at * 8 (S.D. Ohio June 19, 2015) (collecting cases) *report and recommendation adopted*, 2015 WL 6155919 (S.D. Ohio Oct. 20, 2015).  *See also O'day v. Comm'r of Soc. Sec.*, 2015 WL 225467, at *6 (W.D. Mich. Jan. 16, 2015); *Verschueren v. Comm'r of Soc. Sec.*, 2014 WL 4925866, at *10 (W.D. Mich. Sept. 30, 2014); *Caldwell v. Colvin*, 2014 WL 3747548, at *3 (E.D. Ky. July 29, 2014); *Cooper v.*

*Colvin*, 2014 WL 2167651, at *2 (W.D. Ky. May 23, 2014); *Prichard v. Astrue*, 2011 WL 794997, at *15 (M.D. Tenn. Feb. 28, 2011), *report and recommendation adopted*, 2011 WL 1113755 (M.D. Tenn. Mar. 25, 2011); *Peterson v. Comm'r of Soc. Sec.*, 2010 WL 420000, at *7 (E.D. Mich. Jan. 29, 2010).  In *Shope*, the district court explained the reasoning behind this conclusion as follows:

> When the Appeals Council denies a claimant's request for review, the decision of the administrative law judge becomes the final decision of the Commissioner.  *Casey v. Secy. of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir.1993)* (citing 20 C.F.R. § 404.955).  Under such circumstances, a court called upon to review the final decision of the Commissioner of Social Security is confined to a review of the administrative law judge's decision and the evidence presented to the administrative law judge.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (citing *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992)).  **"Whether an ALJ complies with an Appeals Council order of remand is an internal agency matter which arises prior to the issuance of the agency's final decision." *Brown*, 2009 WL 465708 at *6.  The Appeals Council had an opportunity to review the administrative law judge's compliance with its directives, and it did not remand the matter a second time.  This Court has no authority to review the decision of the Appeals Council**, *see Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996), and "Section 405(g) does not provide this court with authority to review intermediate agency decisions that occur during the administrative review process." *Brown*, 2009 WL 465708 at *6.

*Shope*, 2015 WL 3823165 at * 9 (emphasis added).

The Court agrees with the above reasoning and concludes that it lacks jurisdiction to consider whether the third ALJ exceeded the scope of the Appeals Council's February 2013 Order of remand.[14]  Plaintiff's first assignment of error is,

---

[14]  In *Rowe v. Comm'r of Soc. Sec.*, 2014 WL 1364970 (N.D. Ohio March 31, 2014) (Vecchiarelli, M.J.), this Court did consider whether an ALJ complied with the Appeals Council's Order of remand. In *Rowe*, however, neither party cited any of the case law noted above, or otherwise raised the jurisdictional issue presented herein.  Thus, this Court's prior decision in *Rowe* is not dispositive of

therefore, without merit.[15]

### 2.        The ALJ's Credibility Analysis

Plaintiff next argues the ALJ's credibility analysis is not supported by substantial evidence because the ALJ failed to consider the entire longitudinal case record.  Plaintiff also contends that, with regard to her migraines,[16] the ALJ failed to adequately consider the fact that Plaintiff lacked medical insurance.  For the following reasons, Plaintiff's arguments are not well taken.

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).

_____

the issues presented in this case.

[15]  Even if it had jurisdiction to consider the issue, the Court is satisfied that the third ALJ did not exceed the directives of the Appeals Council's February 2013 Order of remand.  At the beginning of her decision, the third ALJ specifically acknowledged the Appeals Council's instructions.  (Tr. 17.)  Consistent with those instructions, the third ALJ obtained supplemental VE testimony regarding the effect of Plaintiff's assessed limitations on her occupational base.  Although the third ALJ fashioned a new RFC, the Court finds the ALJ did not exceed the scope of the Appeals Council's instructions by doing so.  The Appeals Council's Order directed the third ALJ to pose hypothetical questions that reflected the limitations "established by the record **as a whole**" and 'take **any further action needed** to complete the administrative record and issue a new decision."  (Tr. 444-445) (emphasis added).  Thus, the third ALJ did not err by considering evidence post-dating the second ALJ decision, obtaining VE testimony, and crafting an RFC that accounted for this additional evidence and testimony.

[16] The ALJ determined Plaintiff's migraines were non-severe at step two of the sequential evaluation process.  (Tr. 19-20.)  Plaintiff does not challenge that finding.

26

However, the ALJ's credibility determinations must be reasonable and based on evidence from the record.  See *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 313, 312 (6th Cir. 1983).  The ALJ also must provide an adequate explanation for his credibility determination.  "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the allegations are (or are not) credible.'"  S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.).  Rather, the determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight."  *Id.*

Here, a review of the decision reveals the ALJ properly evaluated Plaintiff's credibility.  (Tr. 20-27.)  The ALJ thoroughly examined Plaintiff's daily activities, treatments and her responses to those treatments, clinical examination findings, and physicians' statements of record.  (*Id.*)  Plaintiff's argument that the ALJ failed to consider the entire case record is without merit.  To the contrary, the ALJ systematically discussed the medical evidence regarding Plaintiff's mental impairments and migraines from February 2004 through the date of the decision.  (Tr. 20-27.)  Additionally, the ALJ discussed Plaintiff's daily activities throughout the time period at issue, citing her hearing testimony, function reports, and notations in the medical record regarding her reported activities.  (*Id.*)

Plaintiff complains the ALJ failed to consider the fact that she lost her medical insurance and was unable to pay for her migraine medication.  The Court disagrees.

Although the ALJ found Plaintiff's migraines to be non-severe at step two, the ALJ

considered her hearing testimony regarding the frequency and severity of her migraines

at step four.  (Tr. 22.)  The ALJ also discussed the effectiveness of Plaintiff's migraine

medication and expressly acknowledged Plaintiff's testimony that she had lost her

medical insurance.  (*Id.*)

Additionally, the ALJ provided further reasonable grounds for finding Plaintiff

less than credible.  For example, the ALJ explained:

- Plaintiff's treatment was generally conservative without the medical necessity of psychiatric admission.  (Tr. 23.)  Treatment notes consistently demonstrated only mild to moderate depression and anxiety. (Tr. 24-26.)

- Clinical findings reflected general stability of symptoms and improvement of Plaintiff's condition with medication and treatment throughout the period at issue, despite several personal losses.   (Tr. 24-27.)

- Dr. Leidal found a suggestion that Plaintiff magnified and exaggerated her symptoms during her psychological evaluation.  Dr. Leidal's finding in this regard was consistent with Ms. Schroeder's decision to invalidate her assessment of Plaintiff's physical capabilities based on inconsistencies during testing.  (Tr. 23, 26.)

A review of the decision demonstrates the ALJ considered the record as a

whole in assessing Plaintiff's credibility.  The ALJ highlighted and analyzed evidence

that was inconsistent with Plaintiff's complaints of disabling impairment.  As the ALJ

provided sufficient reasons supported by substantial evidence in the record, remand is

not appropriate on this issue.

### 3.    The ALJ's Analysis of the Opinion Evidence

Plaintiff next argues the ALJ failed to properly evaluate the opinions of

psychological consultative examiner Dr. Leidal and medical expert Dr. Spring.

Specifically, Plaintiff asserts the ALJ erred in rejecting Dr. Leidal's opinion because "other than statements made by Dr. Leidal in the assessment, there is no indication that Plaintiff exaggerated problems to her providers or evaluators."  (Doc. No. 11 at 15.)  With regard to Dr. Spring, Plaintiff contends remand is required because the ALJ failed to either identify or analyze Dr. Spring's opinion.  (*Id.* at 16.)

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R. § 404.1527(e)(2)(i).  Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions.  (*Id.*)  When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight.  (*Id.*)

### a.  Dr. Leidal

The ALJ discussed Dr. Leidal's evaluation at length and determined it was not reliable for several reasons.  First, the ALJ discounted Dr. Leidal's assessment because it was based heavily on Plaintiff's subjective complaints, explaining as follows:

29

 * * * Based on the claimant's statements and tests administered during
the evaluation, Dr. Leidal diagnosed the claimant with dysthymic disorder,
childhood onset and posttraumatic stress disorder on Axis I with a GAF of
50 on Axis V.  He opined that the claimant is not emotionally stable
enough to consider employment although she did not appear to be
organically impaired by her CVA.  However, he noted that she appeared
very nervous and had considerable difficulty maintaining her composure.
In addition, he referenced her MMPI-2 profile suggesting her symptoms
were severe and would cause considerable instability or decompensation.
However, the undersigned notes that Dr. Leidal relied on the claimant's
statements in arriving at his conclusion.  He wrote, "By her own admission,
over the past seven days, she has experienced considerable problems
with irritability, labile moods, and anxiety which are likely symptoms
associated with PTSD."  He concluded, "Given her lack of insight into her
psychiatric and physical health and problems with judgment, she would be
well advised to seek further stabilization before she considers seeking
either further training or job placement. * * *

(Tr. 23-24.)  The ALJ also questioned Dr. Leidal's assessment in light of the fact that

Plaintiff had run out of her medication just prior to the examination:

There is additional cause to question the reliability of Dr. Leidal's
assessment.  The claimant reported to him that her medication from
Portage Path had run out.  The claimant had been provided with her
medications on February 19, 2004 and was told at that time that it would
take two to three weeks for her medications to become effective.  Two to
three weeks had not even passed from February 19, 2004 to Dr. Leidal's
neuropsychological examination on March 2, 2004.  It would not appear that
the claimant should have yet run out of her medications and may not have
been credible in her statements to the Doctor and/or alternatively, the
medications had not yet had time to become effective by March 2, 2004.  In
either case, I do not find Dr. Leidal's assessment to be reliable.

(Tr.  24.)

     The ALJ then cited the disparity between Dr. Leidal's and Ms. Lowery's

assessments as evidence that Plaintiff had exaggerated her symptoms during Dr.

Leidal's examination:

Despite Dr. Leidal's conclusion that the claimant was not emotionally
stable to consider employment, Jill Lowery, LPCC, completed a mental
assessment of ability to do work-related activities on June 21, 2014,

indicative of greater functional ability than assessed by Dr. Leidal.  In the area of making occupational and performance adjustments, she rated the claimant as fair to good, in making personal-social adjustments she rated the claimant as good in most areas and fair in relating predictably to social situations.  (Ex. 9F, 16-17.)  While Ms. Lowery's brief assessment does not negate Dr. Leidal's consultative evaluation of the claimant, the disparity between her assessment and his opinion suggest inconsistencies related to exaggeration by the claimant noted during [Dr. Leidal's] evaluation.

(Tr. 24.)  Finally, the ALJ discounted Dr. Leidal's opinion because "it is indicative of his impression at the time of the evaluation" and "the claimant did receive treatment as recommended within 12 months of his evaluation, with evidence reflecting stability and improvement of her condition."  (Tr. 26.)  Based on the above, the ALJ accorded Dr. Leidal's opinion only "limited weight." (*Id.*)

Plaintiff's argument that the ALJ failed to properly evaluate Dr. Leidal's opinion is without merit for several reasons.  As an initial matter, Plaintiff has not clearly identified any specific functional limitation(s) she believes should have been included in the RFC based on Dr. Leidal's evaluation.  Rather, Plaintiff simply emphasizes Dr. Leidal's general opinion that Plaintiff was "probably not emotionally stable enough . . . to consider employment" and "would be well advised to seek further stabilization before she considers seeking either further training or job placement."  (Tr. 246.)  However, Dr. Leidal's equivocal statement that Plaintiff is "probably" not stable enough to work does not constitute a specific functional limitation.  To the contrary, this statement appears to be an opinion that Plaintiff is unable to work.

It is well established that certain issues are reserved to the Commissioner for determination.  *See* 20 C.F.R. § 416.927(d).  Among these are whether a claimant is disabled.  *See* 20 C.F.R. § 416.927(d)(1) ("We are responsible for making the

31

determination or decision whether you meet the statutory definition of disability.... A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.").  To give controlling weight to a physician's statements that a claimant is unable to work "would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." SSR 96–5P, 1996 WL 374183 at *2 (S.S.A July 2, 1996).  Accordingly, the ALJ's failure to accord greater weight to Dr. Leidal's opinion that Plaintiff is "probably not emotionally stable enough to consider employment" is harmless, as the ALJ was not required to defer to any physician's opinion on the issue of whether Plaintiff was able to work.

Plaintiff also mentions, summarily, that Dr. Leidal found "[h]er judgment for confronting simple circumstances and daily life and understanding what is expected appeared below average to poor."  (Doc. No. 11 at 14.)  To the extent she is arguing the ALJ failed to properly evaluate this opinion, Plaintiff's argument is rejected.  The ALJ thoroughly discussed Dr. Leidal's assessment and articulated several reasons for discounting it.  Moreover, as Dr. Leidal examined Plaintiff on only one occasion, the ALJ was not required to provide "good reasons" for according his opinion limited weight. See Adams v. Colvin, 2015 WL 4661512 at * 21 (N.D. Ohio Aug. 5, 2015) (White, M.J.) ("Dr. House was not Adams' treating physician and, therefore, the ALJ was not required to satisfy the 'good reasons' requirement in rejecting his opinion."); Taylor v. Colvin, 2013 WL 6162527 at * 16 (N.D. Ohio Nov. 22, 2013)(White, M.J.) ("[T]he procedural 'good reasons' requirement does not apply to non-treating physicians").  The analysis

provided by the ALJ regarding Dr. Leidal's evaluation more than satisfies the explanation requirements for non-treating, examining physicians and, further, is supported by substantial evidence.  Accordingly, the Court finds the ALJ did not err in according "limited weight" to Dr. Leidal's assessment.

### b.  Dr. Spring

Plaintiff argues remand is required because the ALJ failed to identify or analyze Dr. Spring's opinion that Plaintiff was limited to simple, low stress work with "no quotas." The Commissioner asserts the ALJ's failure to address Dr. Spring's opinion is harmless error because the RFC is "consistent with Dr. Spring's assessments."  (Doc. No. 14 at 20.)

Dr. Spring, a board certified psychiatrist, testified at Plaintiff's first hearing in September 2007.  (Tr. 555-559.)  Among other things, Dr. Spring testified that, based on his review of the medical record, Plaintiff should be limited to "simple, low stress work with minimal contact with co-workers, no quotas, no conflict resolution, where she pretty much could pace herself."  (Tr. 559.)

At Plaintiff's third hearing in September 2013, the ALJ posed the following hypothetical question to the VE:

> Please assume we have an individual of the claimant's age and education with the past job you described.  Further assume the individual is limited as follows: For my first hypothetical, I have no exertional limitations. The individual is limited to simple, routine and repetitive tasks involving only simple, work-related decisions. **The individual is not able to perform in stressful situations defined as tasks which involve high production quotas or tasks that are production-rate pay, such as assembly line work but the individual can perform goal-oriented work such as office cleaning.**  Should be an environment where there is little variation in

duties that is expected, that is, few, if any, work place changes and any changes that there are should be able to be easily explained. The individual is limited to occasional and superficial interaction with the public and co-workers and it should not be work which involves persuading others, arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety or welfare of others.

(Tr. 614-615) (emphasis added). The VE testified such an individual could perform jobs such as laundry laborer, order puller, and housekeeping cleaner. (Tr. 615.)

Plaintiff's attorney then questioned the VE as follows:

Q: Mr. Burkhammer, the Judge's hypothetical, as I understood it, indicated that there, in this particular hypothetical, no production quotas, rather that there would be goals, goal-oriented positions. Do I understand that correctly?

A: I believe so.

* * *

ALJ: I think it was high production quotas.

VE: Right.

BY THE ATTORNEY:

Q: Wouldn't be it correct , Mr. Burkhammer, that each of the jobs you've mentioned here today have some expectation by the employer of completing – producing and completing a job, whether it's making sure that all of the rooms that they're charged with housekeeping or they get the orders pulled, an effective time frame, so that the product can move on down the line, that is, you know, whether it's loaded on a truck and taken out or whatever it might be – while we're not going to say someone has to make sure that 20 sheets an hour get laundered, for instance, there's still some expectation from an employer that these things do get done in a timely fashion?

A: There's always expectation in any job.

(Tr. 617-618.) The ALJ later expressly confirmed with the VE that the hypothetical question involved high production quotas and the identified jobs "didn't include high

34

production quotas." (Tr. 619.)

The ALJ formulated the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant is limited to simple, routine, and repetitive tasks involving only simple, work-related decisions; **she is not able to perform in stressful situations defined as tasks that involve high production quotas or tasks at a production rate pace (e.g., assembly line work) but can perform goal oriented work (e.g., office cleaner) in an environment where there is little variation in duties expected with few, if any, work place changes and any changes are easily explained**; she can have occasional and superficial interaction with the public or coworkers, which does not involve persuading, arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety or welfare of others.

(Tr. 21-22.) The ALJ did not acknowledge or address Dr. Spring's opinion in the decision.

The Commissioner admits the ALJ failed to address Dr. Spring's opinion but argues such error is harmless. (Doc. No. 14 at 20.) The Court agrees. Although the ALJ did not expressly discuss Dr. Spring's opinion, the Court finds that Plaintiff's RFC accounted for Dr. Spring's pace restriction by distinguishing between work involving "high production quotas or tasks at a production rate pace" and "goal oriented work." (Tr. 21-22.) Specifically, the Court finds the ALJ sufficiently addressed the issue of quotas by crafting the RFC to preclude Plaintiff from performing "tasks that involve high production quotas or tasks at a production rate pace (e.g., assembly line work),**"** and, instead, limiting her to "goal oriented work (e.g., office cleaner)." (Tr. 21-22.) By distinguishing between these two types of work, the ALJ acknowledged Plaintiff's pace limitations and fully accounted for Dr. Spring's opinion in the RFC. This is particularly

evident when this limitation is considered in the context of the VE's testimony during the third hearing, during which this distinction was discussed.  (Tr.  617-619.)

Morever, at step three, the ALJ did expressly consider Plaintiff's limitations in concentration, persistence, or pace, finding she has only "mild difficulties."  (Tr. 21.) Plaintiff does not specifically challenge this finding, or point to any evidence in the record indicating it is not supported by substantial evidence.  Additionally, state agency physicians Drs. Semmelman and Pawlarczyzk reviewed Plaintiff's medical records and also concluded she had only mild difficulties in maintaining concentration, persistence, and pace.  (Tr.  225.)

Thus, the Court finds that, although the ALJ did not adopt Dr. Spring's exact phrasing, the limitations in Plaintiff's RFC address Dr. Spring's concerns regarding Plaintiff's ability to perform work.  *See Divins v. Astrue*, 2012 WL 220246 at * 11 (S.D. Ohio Jan. 25, 2012) ("There is no requirement that the ALJ adopt the precise language offered by a medical source, as long as the ALJ's conclusion is supported by substantial evidence").  The ALJ's failure to specifically address Dr. Spring's opinion was, therefore, harmless.

### 4.    The ALJ's RFC Finding

In her final assignment of error, Plaintiff argues the RFC assessment is flawed because her condition has changed over time and "a single residual functional capacity cannot support a decision that spans over nine years of disability."  (Doc. No. 11 at 9.) Specifically, Plaintiff contends the record contains clear indications of "time periods when her limitations were greater than other times," particularly with respect to her social functioning, ability to care for her basic personal needs, and migraines.  (*Id.*)  She

maintains the ALJ's RFC finding fails to adequately account for periods during the pendency of her administrative appeal where her symptoms were markedly worse.

The Commissioner argues the RFC is supported by substantial evidence.  She maintains Plaintiff has failed to cite any law requiring the ALJ to assess more than one RFC because of the length of the pendency of her appeal.  In addition, the Commissioner argues Plaintiff has failed to identify any credible symptoms or limitations that were not adequately accommodated by the RFC.

RFC is an indication of a claimant's work-related abilities despite his limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.945(e).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.945(a), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.  While RFC is for the ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, Plaintiff fails to identify any specific time period(s) of at least 12 months in duration for which she believes the ALJ should have assigned a more restrictive RFC.  Nor does she identify any particular additional functional limitations that she believes should have been accommodated during these unspecified periods.  Finally, Plaintiff fails to direct this Court's attention to legal authority requiring an ALJ to formulate separate RFCs for different time periods during the pendency of a claimant's SSI application.  Accordingly, the Court finds Plaintiff has failed to demonstrate the RFC

herein is not supported by substantial evidence.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: February 26, 2016


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**